IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs January 10, 2012

**STATE OF TENNESSEE v. MICHAEL CLARK**

**Direct Appeal from the Criminal Court for Shelby County**
**No. 07-04686      Chris Craft, Judge**

**No. W2010-02566-CCA-R3-CD  - Filed April 17, 2012**

The defendant, Michael Clark, was convicted by a Shelby County Criminal Court jury of
voluntary manslaughter, a Class C felony, and sentenced to fifteen years in the Department
of Correction, to be served consecutively to another sentence.  On appeal, he argues that the
evidence was insufficient to sustain his conviction, the trial court erred in allowing certain
photographs into evidence, and the trial court imposed an excessive sentence.  After review,
we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which THOMAS T. WOODALL and
JOHN EVERETT WILLIAMS, JJ., joined.

Joseph A. McClusky (on appeal); and William Massey, Lorna McClusky, and Lauren Fuchs
(at trial), Memphis, Tennessee, for the appellant, Michael Clark.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Assistant Attorney
General; Amy P. Weirich, District Attorney General; and Alanda Dwyer and Abby Wallace,
Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

On June 28, 2007, the defendant was charged with the second degree murder of
Antonio Redmond and the attempted second degree murder of Marcus Hall.  At the
conclusion of the defendant's first trial, the jury was unable to reach a verdict as to count
one, the second degree murder of Redmond, but convicted the defendant, in count two, of
the attempted second degree murder of Hall.  State v. Michael Clark, No. W2009-01649-

CCA-R3-CD, 2011 WL 300211 (Tenn. Crim. App. Jan. 21, 2011), perm. to appeal denied (Tenn. May 25, 2011).[1]  The defendant was retried on the first count before a new jury, from which we summarize the following testimony.

## State's Proof

Callie Redmond, the victim Antonio Redmond's[2] mother, testified that her son died on September 10, 2006, at the age of twenty-eight.

Monterius Freeman testified that he was eight years old at the time of the shooting and was at his great-grandmother's house on Winnona Avenue in Memphis when it happened.  As Freeman was in the front yard playing with other children from the neighborhood, he saw the defendant fire a gun and heard four gunshots.  Freeman was not sure where the defendant lived but recalled having seen him at the house next door to his great-grandmother's before.

Freeman testified that, prior to the shooting, he saw a man drive up to the house next door to his grandmother's, get out of the car, and talk to someone at the house.  Freeman could not discern what was said between the man and the person at the house and could not tell if they were arguing.  Once the man returned to the car, the defendant approached, the two spoke for a few minutes, and then Freeman heard gunshots.  Freeman recalled that the defendant had a gray or silver gun, but he did not see anyone in the car with a gun.  After the shooting, the car departed quickly with its windows broken out, but Freeman did not see where the defendant went.

Freeman testified that he talked to the police at both his grandmother's and great-grandmother's houses and told them what he had witnessed.  When the police showed him a photographic array, Freeman identified the defendant as the man he saw shooting.

On cross-examination, Freeman acknowledged that he told the police that, when the man got out of the car and approached the house, the man initially called to one of the girls and she talked to him briefly before her grandmother came outside and started arguing with the man.  However, Freeman clarified that the girl's grandmother and the man were not arguing, they were talking.  Freeman admitted that he also told the police that, when the defendant came walking up the street, he and the other man, who was already back in the

[1]We note that this case has been designated as "not for citation" by the Tennessee Supreme Court.

[2] Because this appeal deals solely with the defendant's voluntary manslaughter conviction, we will hereinafter refer to Antonio Redmond as "the victim" and to Marcus Hall as "Hall."

car, began to argue. However, at the time of trial, Freeman did not recall seeing the men arguing, only talking, even after being shown his statement to police. When asked about his testimony at an earlier hearing, Freeman acknowledged having testified that the men were arguing outside on the sidewalk, and then he testified that the men were in fact arguing.

Freeman testified that he actually saw the defendant fire a gun and that the defendant was standing on the passenger side of the car near the front door. Freeman recalled that he heard three or four shots before the car drove away. When the gunfire began, Freeman ran to his grandmother's house, upon the direction of his grandfather who was also outside.

On redirect examination, Freeman testified that he could not hear what the two men were saying. He also testified that the gunshots were fired in quick succession and that the car had begun to drive off by the time Freeman started running inside.

Officer Kevin Baker with the Memphis Police Department testified that he heard about the incident on Winnona Avenue around 1:45 or 1:50 in the afternoon of September 10, 2006. As he was traveling south on Hollywood Street en route to the scene of the shooting, he saw what appeared to be a car accident in which the rear of the car was resting on a pole on the sidewalk. When Officer Baker and other officers converged on the scene, they saw two people in the car – one who was sitting in the car, moaning, and the other with his feet in the car but his back on the pavement outside. Officer Baker could tell that the man on the ground was "in bad shape," but he did not know the nature of his injuries. He worked to preserve the scene and keep anyone from approaching the car, but he did not speak to either of the accident victims. He did not see any weapons; however, he acknowledged that he was not looking for any.

Officer Baker testified that he left the scene of the accident and headed to the scene on Winnona Avenue, which was approximately one minute away. When he arrived, there were no officers, the suspected shooter, or any other people there waiting.

On cross-examination, Officer Baker testified that he was not the officer who secured the car at the scene of the accident; he only kept people from approaching the car. He stated that he did not look for any weapons between the wreck site and the scene of the shooting, although it was not unusual for weapons to be discarded after a shooting.

Officer Robert Jones with the Memphis Police Department testified that he was among the officers who responded to the scene of the accident on Hollywood Street. The two men in the vehicle advised that they both had been shot. No weapons were collected on the scene, and neither man was armed when he was taken to the hospital. The vehicle was towed and held at the crime scene processing area for the homicide bureau.

Officer Jones testified that he talked to Hall and the victim. The victim believed that he was dying and told Officer Jones that he and his friend had been a few blocks away when "he heard a pop, . . . but he got scared and . . . he just took off. He just put his foot on the gas and drove off to try to get away. And the next thing he kn[e]w they ended up there at Hollywood [Street.]"

On cross-examination, Officer Jones testified that he visually looked inside the car and did not see any weapons, shell casings, or bullets. He did not search the area between the accident site and the shooting for weapons. Officer Jones did not know how long it took for an officer to arrive at the accident site following the crash. On redirect, Officer Jones said that the officers formed a barrier around the scene to keep the area secure but, on recross, acknowledged that there was obviously "a little time" before officers were present to secure the scene.

Marcus Hall testified that he had known the victim for at least fifteen years and that the two had been best friends. On September 10, 2006, he and the victim were driving around North Memphis, and Hall wanted to stop at the home of Rosie Combs, the mother of his ex-girlfriend, Lakeisha Beasley, to retrieve some of his clothes while they were in the area. Hall and Beasley had dated for four or five months but had been broken up for "a couple of weeks."

Hall testified that the victim drove him to Combs's house on Winnona Avenue, and they pulled up in front of the house with the passenger side, where Hall was sitting, closest to the home. The victim waited in the car, while Hall got out and asked Beasley's daughter, who was playing outside with other children, if her mother was home. Beasley's daughter told Hall that her mother was not home but that her grandmother was home.

Hall testified that he knocked on the door, and Combs answered, "enraged . . . [and] heated up already." Combs yelled at him, but he did not yell back. Hall explained to her why he was there, but Combs "was enraged" and would not give him his clothes. The two talked for a couple of minutes in the doorway before the victim called for Hall to forget about his clothes, and Hall returned to the car. As soon as he got in the car, Hall noticed the defendant standing next to the front passenger side door. Hall had never seen the defendant before and was wondering who he was when a gunshot sounded. The defendant fired four or five shots. The first shot broke out one of the windows. The second shot hit Hall in the back as he stretched over to protect the victim, who was in the driver's seat. Hall fell into the backseat of the car and told the victim to drive away. Hall remembered that two more shots were fired before they could pull away.

-4-

Hall testified that they drove toward Hollywood Street and traveled for a couple of blocks before the car wrecked. Hall lost consciousness after the wreck, and he did not wake up until he was at the hospital where he learned that the victim had also been shot and had died from his wounds. Photographs of Hall's scar from his gunshot wound were admitted into evidence over defense objection. Hall was in the hospital four or five hours before being released.

Hall testified that the police came and talked to him at the hospital and had him view a photographic array from which he identified the defendant as the shooter. Hall said that neither he nor the victim was armed when they went to Beasley's mother's house that day. Hall admitted that he had prior convictions for possession of cocaine with intent to sell in 2002 and possession of marijuana with intent to sell in 2005 and that at the time of trial he again had charges pending for possession of cocaine and marijuana with intent to sell.

On cross-examination, Hall testified that Beasley lived in an apartment when they first started dating but soon after moved into a house on Lucy Avenue where he frequently stayed with her. Beasley's daughter stayed with them sometimes but usually stayed at Combs's house on Winnona Avenue. Hall met members of Beasley's family when they were dating, but he did not know them well or have a relationship with them. Hall had never met the defendant, Beasley's brother.

Hall testified that, by September 2006, he and Beasley were no longer dating and were on bad terms due to Beasley's having contracted a sexually transmitted disease. After Beasley and Hall came to be on bad terms, Beasley moved in with her mother on Winnona Avenue, and Hall began to try to get his clothes back from Beasley. Earlier in the day of the shooting, Hall and Beasley got into an argument on the phone over his clothes, so when he and the victim were in the area later, he decided to stop by Beasley's mother's house to try to retrieve them from her even though he did not know whether his clothes were actually there.

Hall testified that, when Beasley's mother, Combs, came to the door, he tried to explain to her that he was there to get his clothes, but "she was cussing as soon as she seen [him]." He recalled that Combs was "cussing, fussing, real loud" and that she did not invite him inside. He estimated that he was at Combs's door for "a couple of minutes," but he reiterated that "[he] wasn't arguing. She was arguing."

Hall testified that, once he got back into the car, the defendant immediately appeared at the side of the car. He said that he never said a word to the defendant, as there was no time before the defendant started shooting. The defendant did not say anything to him prior to shooting, and he denied telling Officer Patterson that he and the defendant had gotten into

an argument. Hall stated that he did not have a gun that day. Hall admitted that the victim would still be alive had he called the police to get his clothes back instead of trying to do so himself.

Officer Kay Turnmire with the Memphis Police Department Crime Scene Unit testified that she responded to the scene of the shooting, which officers had already attempted to preserve. Officer Turnmire photographed and diagramed the scene, as well as collected evidence. Officer Turnmire observed glass particles and a bullet casing in the street. No other evidence was located at the scene. Officer Turnmire believed, based on her training and experience, that the bullet casing collected from the scene was .22 caliber. After photographing and collecting the evidence at the scene on Winnona Avenue, Officer Turnmire went to the scene of the crash on Hollywood Street. She did not search for weapons in the area between the scene of the shooting and the scene of the crash.

Officer Stacy Milligan with the Memphis Police Department Crime Scene Unit testified that he photographed and processed the crash scene on Hollywood Street. Upon his arrival, Officer Milligan observed a vehicle that "had been obviously shot up," a crowd of people, and some bloody clothing. Other officers had already cordoned off the scene, and Officer Milligan immediately started taking photographs because it was raining. The victims had already been taken away from the scene. After photographing the scene, Officer Milligan searched the area for any evidence. He found a bloody tee-shirt near the car and a piece of shrapnel on the trunk of the car. He also documented some bloodstains on one of the car seats. After Officer Milligan completed his search, the car was towed to the crime scene building for further processing.

Officer Charles Cathey with the Memphis Police Department Crime Scene Unit testified that he photographed and processed the victim's vehicle after it was towed to the crime scene building. Officer Cathey found two shell casings in the vehicle: one on a white tee-shirt on the front passenger seat and the other in the front passenger floorboard. Officer Cathey noted on the evidence collection envelope that both casings were .22 caliber.

Terri Arney, a special agent forensic scientist with the Tennessee Bureau of Investigation ("TBI") Crime Laboratory, testified that she is assigned to the firearms identification unit and, in such role, tested several items of evidence in this case. One of the items was a bullet core that was consistent with being the core from a .25 caliber bullet, but she could discern no other information about the bullet core since it would not have touched the inside of the firearm to bear any identification markings. One of the other items was a bullet pack recovered from the body of the victim, which was also .25 caliber. Agent Arney analyzed the cartridge casings from the car and the casing recovered from the scene of the shooting and determined that all of the casings were .25 caliber. She was able to determine

that all three casings had the same class characteristics, "same shape and size firing pin impression," as well as similar individual characteristics. However, the similarities were not enough for her to determine whether the casings were fired from the same firearm without having the firearm to aid in the comparison. Agent Arney also explained that different weapons eject cartridge casings differently and that how the gun is being held or whether it is moving also affect how the casing is ejected. She said it was possible for a weapon fired outside a vehicle to eject a casing inside the vehicle, but it was equally possible that it would not be ejected into the vehicle.

Lieutenant Ronald Collins, who was assigned to the Memphis Police Department Homicide Bureau at the time of the incident, testified that he was the case officer in charge of the investigation. When he received the case, the defendant had already been named as a suspect and, despite his efforts to locate the defendant, he was unsuccessful in doing so. Lieutenant Collins was also responsible for transporting evidence to the TBI for analysis. The weapon used to kill the victim was never located.

Officer Walter Doty with the Memphis Police Department testified that he was assigned to uniform patrol at the time of the shooting and, in such role, went to a residence at 2484 Winnona Avenue on September 11, 2006, in an effort to locate the defendant. Based on information he received shortly after leaving the residence, Officer Doty went to the residence across the street, 2479 Winnona Avenue, where he located the defendant inside the bathroom of the residence. He took the defendant into custody without incident.

Dr. Karen Chancellor, chief medical examiner for Shelby County, testified that she performed the autopsy on the victim and determined the cause of death to be a gunshot wound to the chest. Her external examination revealed a gunshot entrance wound on the right side of the victim's chest under the armpit area. She did not note any soot or stippling around the wound. Dr. Chancellor's internal examination of the victim revealed that the bullet passed through the victim's right lung, nicked the liver, passed through the heart, and came to rest on the left side of the chest wall. Toxicology tests indicated that the victim had probably used marijuana on the day of his death as well as many days prior to his death.

The parties entered a stipulation that the body upon which Dr. Chancellor conducted an autopsy was that of the victim.

**Defendant's Proof**

Officer James Patterson with the Memphis Police Department testified that he responded to the scene of the crash on Hollywood Street on September 10, 2006, and Hall told Officer Patterson that he had been arguing with the person who shot him. On cross-

examination, Officer Patterson stated that the victims had not been allowed to move when he arrived and only a few onlookers were present. Officer Patterson acknowledged that he did not remember personally talking to Hall and that someone must have said something to lead him to the conclusion that Hall and the person who shot him had been arguing. Officer Patterson did, however, recall personally talking to the victim, and the victim told him that he was scared and asked the officer to pray with him. The victim also told Officer Patterson that, as he and Hall were pulling off, someone started shooting at them and he did not know why.

Rosie Combs, Lakeisha Beasley's mother, testified that she lived at 2484 Winnona Avenue on September 10, 2006. On that date, she was on her way outside to check on her grandchildren when Hall approached her front door, and the two of them began arguing about Hall's clothes. Hall thought that some of his clothes were at her house, but none were. She recalled that it was more of an argument than a conversation because Hall was "cursing and stuff saying he kn[e]w his stuff was in my house but I told him wasn't nothing in my house." During the argument, Hall was "moving his hand, one of them but one of them he never did move. He kept it on his side." The argument moved off the porch to down by the fence near the sidewalk, until the driver of the car honked the horn and Hall got into the car.

Combs testified that the car started to drive away, and her son, the defendant, came from across the street and was talking to her when the car backed up and stopped in front of her house. Hall then asked the defendant if he had Hall's clothes, and the two of them started arguing. As the men were arguing, three or four shots were fired, but Combs did not see who fired the shots. Combs recalled that Hall "was acting real ugly and mean like he wanted to do something" during all the events that led up to the gunshots and that she was afraid for herself and her grandchildren.

On cross-examination, Combs acknowledged that, when the defendant came across the street after the car Hall was in started to pull away, she told him that Hall was Beasley's ex-boyfriend. Combs said that she could not remember whether she told Lieutenant Collins in her statement on September 11, 2006, about Hall and the victim driving away and then coming back, and she acknowledged that "[i]t might not be in [her statement]." She also did not recall telling Lieutenant Collins that she was walking back toward the house and the defendant was walking behind her when the shooting started. She denied telling Lieutenant Collins that she was actually back in the house for five to ten seconds before hearing the shots.

On redirect, Combs stated that she was afraid that Hall was going to hurt her or the defendant and that Hall threatened the defendant and the defendant appeared to be afraid. However, on recross examination, she acknowledged that she never mentioned previously

that Hall had threatened the defendant.

The parties entered a stipulation that Marcus Hall had two assault convictions.

Following the conclusion of the proof, the jury convicted the defendant of voluntary manslaughter as included in the indictment.

## ANALYSIS

### I. Sufficiency of the Evidence

The defendant argues that the evidence was insufficient to sustain his conviction for voluntary manslaughter, asserting that, if the jury found "adequate provocation to justify [his] impassioned state, that same provocation justifies his self-defense."

When the sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212

Tenn. 464, 370 S.W.2d 523 (1963)).

"A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The defendant was charged with second degree murder – a knowing killing of another. See Tenn. Code Ann. § 39-13-210 (2006). However, the jury found him guilty of the lesser-included offense of voluntary manslaughter, which is defined as "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Id. § 39-13-211(a).

At the time of the offense, the self-defense statute provided:

A person is justified in threatening or using force against another person when, and to the degree, the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force. The person must have a reasonable belief that there is an imminent danger of death or serious bodily injury. The danger creating the belief of imminent death or serious bodily injury must be real, or honestly believed to be real at the time, and must be founded upon reasonable grounds. There is no duty to retreat before a person threatens or uses force.

Tenn. Code Ann. § 39-11-611(a) (2006).

When the defense of self-defense is fairly raised by the evidence, the State carries the burden of proof to negate the defense beyond a reasonable doubt. See id. § 39-11-201(a)(3); State v. Belser, 945 S.W.2d 776, 782 (Tenn. Crim. App. 1996). However, whether a defendant acted in self-defense is a question of fact for the jury to determine. See State v. Goode, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997); State v. Ivy, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993). It is within the prerogative of the jury to reject a claim of self-defense. Goode, 956 S.W.2d at 527.

In the light most favorable to the State, the evidence shows that the defendant fired multiple shots upon unarmed victims in response to victim Hall's confrontational conduct in attempting to retrieve his clothing from Combs's house. The jury heard testimony that Hall acted threateningly toward the defendant and his mother, Combs, and that he had come to Combs's house unannounced demanding clothing that she did not have. The jury obviously determined that the defendant acted in a state of passion produced by adequate

provocation but, as was its prerogative, rejected his claim that he killed the victim in self-defense. It is not the province of this court to second-guess factual determinations made by the jury. Therefore, we conclude that the evidence was sufficient to convict the defendant of voluntary manslaughter.

## II. Photographs

The defendant next argues that the trial court erred in allowing the State to introduce photographs of Hall's healed gunshot wound, asserting that the probative value of the photographs was minimal and cumulative because Hall testified to the location of his wound and that it left scarring and that there was a risk of unfair prejudice in that the photographs "would tend to unfairly elicit sympathy for Mr. Hall and against the [d]efendant."

The admissibility of photographs generally lies within the sound discretion of the trial court and will not be overturned on appeal absent a clear showing that the trial court abused its discretion. State v. Faulkner, 154 S.W.3d 48, 67 (Tenn. 2005); State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978). "Tennessee courts follow a policy of liberality in the admission of photographs in both civil and criminal cases." State v. Morris, 24 S.W.3d 788, 810 (Tenn. 2000). In determining whether a photograph is admissible, the trial court must first determine whether it is relevant to a matter at issue in the case. See Tenn. R. Evid. 401; State v. Vann, 976 S.W.2d 93, 102 (Tenn. 1998); Banks, 564 S.W.2d at 949. The court must next consider whether the probative value of the photograph is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Tenn. R. Evid. 403.

In this case, the defendant objected to the relevance and lack of probative value of the photographs, as well as the danger of confusing the issues. The State responded that the photographs were relevant as the location of the wound on Hall's back tended to negate the claim of self-defense. In ruling on the issue, the trial court ruled that shooting someone in the back tended to negate a claim of self-defense and that there was no unfair prejudice as the wound was healed and not an open wound.

On appeal, as noted above, the defendant challenges the cumulative nature of the photographs and the risk of unfair prejudice caused by their admission. We note that "a party is bound by the ground asserted when making an objection. The party cannot assert a new or different theory to support the objection in the motion for a new trial or in the appellate court." State v. Adkisson, 899 S.W.2d 626, 634-35 (Tenn. Crim. App. 1994). Waiver notwithstanding, we cannot conclude that the trial court abused its discretion in admitting the photographs into evidence. The photographs were relevant and probative to negate the defendant's claim of self-defense and illustrate and support Hall's testimony that

he was shot in the back. "Photographs are not necessarily rendered inadmissible because they are cumulative of other evidence or because descriptive words could be used." State v. Faulkner, 154 S.W.3d 48, 70 (Tenn. 2005) (citing Collins v. State, 506 S.W.2d 179, 185 (Tenn. Crim. App. 1973)). Moreover, the wound shown in the photographs was completely healed and not graphic in any manner. Therefore, we do not discern any abuse of discretion in the trial court's conclusion that there was no unfair prejudice.

## III. Sentencing

The trial court conducted a sentencing hearing, after which, the defendant was sentenced as a persistent offender to fifteen years in the Department of Correction, to be served consecutively to a twenty-year sentence on the attempted second degree murder conviction from the original count two of the indictment. The defendant argues that the trial court imposed an excessive sentence.

When an accused challenges the length and manner of service of a sentence, it is the duty of this court to conduct a *de novo* review on the record "with a presumption that the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d) (2006). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The presumption does not apply to the legal conclusions reached by the trial court in sentencing the accused or to the determinations made by the trial court which are predicated upon uncontroverted facts. State v. Butler, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); State v. Smith, 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994); State v. Bonestel, 871 S.W.2d 163, 166 (Tenn. Crim. App. 1993), overruled on other grounds by State v. Hooper, 29 S.W.3d 1, 9 (Tenn. 2000).

In conducting a *de novo* review of a sentence, this court must consider (a) any evidence received at the trial and/or sentencing hearing, (b) the presentence report, (c) the principles of sentencing, (d) the arguments of counsel relative to sentencing alternatives, (e) the nature and characteristics of the offense, (f) any mitigating or enhancement factors, (g) any statistical information provided by the administrative office of the courts as to Tennessee sentencing practices for similar offenses, (h) any statements made by the accused in his own behalf, and (i) the accused's potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-103, -210 (2006); State v. Taylor, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401 (2006), Sentencing Commission Cmts.; Ashby, 823 S.W.2d at 169.

The defendant argues that the fifteen-year sentence imposed by the trial court was excessive. In imposing a specific sentence within a range, a trial court "shall consider, but is not bound by" certain advisory sentencing guidelines, including that the "minimum sentence within the range of punishment is the sentence that should be imposed" and that "[t]he sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors[.]" Tenn. Code Ann. § 40-35-210(c)(1), (2). The weighing of the various mitigating and enhancement factors is "left to the trial court's sound discretion." State v. Carter, 254 S.W.3d 335, 345 (Tenn. 2008).

Here, the trial court enhanced the defendant's sentence based on a finding that the defendant had a previous history of criminal convictions in addition to those necessary to establish his range as a persistent offender, see Tenn. Code Ann. § 40-35-114(1), and gave such factor "a lot of weight" in observing that the defendant had six additional felonies. The court also found that the defendant had a previous history of unwillingness to comply with the conditions of a sentence involving release into the community, specifically three violations of probation, see id. § 40-35-114(8), as well as that he possessed or employed a firearm during the commission of the offense, see id. § 40-35-114(9). The trial court addressed the mitigating factors but determined that none applied.

We cannot conclude that the trial court abused its discretion in imposing a fifteen-year sentence. The presentence report shows that the defendant has a criminal record starting in 1990 at the age of eighteen and far exceeding that required to classify him a persistent offender. The presentence report also shows that the defendant violated the terms of a sentence involving release into the community more than once in the past. The defendant's employment of a firearm during the commission of the offense is unquestioned. Thus, the record supports the sentence imposed by the trial court.

The defendant also challenges the trial court's imposition of consecutive sentencing. Tennessee Code Annotated section 40-35-115(b) provides that it is within the trial court's discretion to impose consecutive sentencing if it finds by a preponderance of the evidence that any one of a number of criteria applies, including that "[t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." Tenn. Code Ann. § 40-35-115(b)(2), (4) (2006). When a trial court bases consecutive sentencing upon its classification of the defendant as a dangerous offender, it is required to make further findings that the aggregate length of the defendant's sentence reasonably relates to the severity of his offenses and is necessary to protect the public from further criminal conduct of the defendant. State v. Lane, 3 S.W.3d 456, 460-61 (Tenn. 1999); State v. Wilkerson, 905 S.W.2d 933, 937-38 (Tenn. 1995). The trial court must "specify the reasons" behind its imposition of a consecutive sentence. See Tenn. R. Crim. P. 32(c)(1). The criteria listed

in section 40-35-115(b) are stated in the alternative; therefore, only one need exist to support the appropriateness of consecutive sentencing.

In determining that the defendant's sentence should be served consecutively to his sentence for attempted second degree murder, the trial court found that the thirty-six-year-old defendant was a professional criminal who had devoted his life to criminal acts as a major source of livelihood, see Tenn. Code Ann. § 40-35-115(b)(1), in that he had committed robberies and thefts and only held a job for an approximate total of four months his entire life. The court also found that the defendant was an offender whose record of criminal activity was extensive, see id. § 40-35-115(b)(2), and that he was a dangerous offender whose behavior indicated little or no regard for human life and that confinement for an extended period of time was necessary to protect society from his unwillingness to lead a productive life and his resort to criminal activity in furtherance of an anti-societal lifestyle and that an extended sentence reasonably related to the seriousness of the offense, see id. § 40-35-115(b)(4).

We need not address whether the trial court was correct in its determinations that the defendant was a professional criminal and a dangerous offender, as the presentence report relays a record of criminal activity that is certainly extensive. The trial court need only find one factor under Tennessee Code Annotated section 40-35-115(b) to support consecutive sentencing. Because the trial court found that the defendant had an extensive criminal record, we affirm the trial court's imposition of consecutive sentences.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE

-14-